[Strawbridge *et al. v.* The City of Philadelphia.]

JANUARY 30TH, 1882.—PER CURIAM: We affirm this judgment upon the opinion of the learned president of the Court below.

Judgment affirmed.

JANUARY TERM, 1880, No. 72.                          JUNE 6TH, 1882.

# Strawbridge *et al. versus* The City of Philadelphia.

1. The transmission of gas lawfully manufactured by a city for the purpose of public and private illumination, through pipes of good quality laid under the streets, is not carrying on such business in an unreasonable way, so as to constitute a nuisance.

2. Without proof of negligence, a city cannot be held responsible for damages caused by an explosion of gas escaping from its pipes so laid.

3. The maxim, *Sic utere tuo ut alienum non lœdas*, does not apply to such case.

4. *Quœre*, whether a citizen, sharing in the benefits and advantages of gas manufactured by the city, and conducted through pipes laid in the streets by virtue of an ordinance of councils, legally passed and approved, waives his right to compensation for injury accidentally resulting therefrom, without fault or negligence on the part of the city.

5. Under the Act of April 2d, 1790, which provides that the mayor and councils of the city of Philadelphia "shall have full power and authority to make, order, constitute and establish such and so many laws, ordinances, regulations, and constitutions, as may be convenient and necessary for the purpose of . . . . . lighting," its streets, lanes, and alleys, the city has the right, by implication, to direct by ordinance that gas-pipes shall be laid in the streets for the purpose of lighting them.

6. *Semble*, That one who, contrary to an ordinance of the city, excavates beyond the curb-line into a street, and in doing so removes the barrier of earth between the gas-pipes and his premises, and opens a communication between them, is guilty of contributory negligence, and is precluded from recovery for damages caused by the escape of gas into his premises, and its explosion, even if there be negligence on the part of the city.

Before SHARSWOOD, C. J.; MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ.

Error to the Court of Common Pleas, No. 4, for the *County of Philadelphia.*

Case, by J. C. Strawbridge and Isaac H. Clothier, trading as Strawbridge & Clothier, against the City of Philadelphia, to recover damages for the destruction of certain goods on the premises of the plaintiffs, caused by the escape of gas from pipes of the defendant and its ignition, and for the subsequent hindrance of the business of the plaintiffs.

The first count of the *narr* alleged negligence. The second count set forth the ownership by the plaintiffs of the premises, which contained goods of great value; that the defend-

[Strawbridge *et al. v.* The City of Philadelphia.]

ant was possessed of works for the making of gas, and had pipes for its distribution; and averred, " that the said defendant ought to have hindered and prevented the escape and flow of gas out of said pipes and into the said premises ;" and that the defendant " permitted large quantities of gas to escape from said pipes into the premises of the said plaintiffs, so that the same became ignited and thereby destroyed," etc.

By agreement, the case was referred to Rufus E. Shapley, who found the facts substantially as follows:

The plaintiffs were, in 1874, owners in fee of the premises at the northwest corner of Eighth and Market streets, in the city of Philadelphia, and carried on therein their business as dry goods merchants.

For the purpose of enlarging their basement for the convenience of their business, they had, some time prior to the explosion of gas, made an excavation under the pavement along Eighth Street, and covered it with glass and large paving stones, supported by iron girders. In order to prevent dampness the wall and ceilings were lined with boards. They had, also, for their own convenience made a further excavation, extending outward into Eighth Street two feet six inches beyond the curb-line, and had built therein a brick fire-proof vault, composed of two walls tied together at intervals by whole bricks, but so constructed as to leave an air-chamber between them. The inner wall rested on a stone, and the outer one on the earth. Two iron doors opened outward from the safe into the basement. The walls of the safe were pinned or tied into the stone walls of the basement to prevent them from sinking. In making this excavation the earth was cut down as straight as possible, and the brick walls built as closely against the earth as practicable, but the small space between was not filled up.

This excavation into the street beyond the curb-line, for the accommodation of the fire proof vault, was in violation of an ordinance of the city of Philadelphia, approved November 12th, 1855 (City Ordinances, 1855, 246), which prohibited the digging of any vault beyond the curb-line.

At the time of the explosion the plaintiffs had stored in their basement a large and valuable stock of linens, white goods, etc.

On the 10th of August, 1874, William W. Timson, a contractor, was engaged, under a contract with the city of Philadelphia, in building a sewer along Eighth Street, northward from Market Street, past the premises of the plaintiffs. Shafts were sunk at intervals, to enable the workmen to descend into and work at the tunnel which had to be dug

under the street for the sewer, and in the prosecution of this work the gas main or pipe which ran along and under Eighth Street, was occasionally exposed. This gas main or pipe was owned by the city of Philadelphia, the defendant, and was operated by it for the transmission of gas for lighting the city. It had been previously laid in pursuance of an ordinance of councils, approved March 21st, 1835 (§ 4, Ordinance 21st March, 1835), which authorized and directed the trustees of the gas works to lay pipes for the distribution of gas through the city.

When the workmen reached the plaintiff's fire-proof vault, projecting into the street as before described, with their tunnelling, the earth alongside of the outer wall of the vault, and part of the earth from under it, fell away, and the gas main, against which the wall pressed, was exposed. The gas main at this point, as well as at other points where it became exposed, was carefully shored up by the workmen employed by the contractor, to guard against its breaking, and shores were also placed under the walls of the vault, from which the bricks had commenced to fall away.

Between the hours of six and nine o'clock, on the evening of the 10th of August, 1874, this gas main or pipe in front of the plaintiff's fire-proof vault was broken, by causes or persons unknown, and in consequence the gas escaped and found its way around, under, into, and through this fire-proof vault, and thus into the plaintiff's basement, and behind the board lining before mentioned; and when some of their employés and a plumber went into the basement with a lighted candle and opened a small door in the board lining for the purpose of stopping a leak of water, the gas ignited and an explosion resulted which blew open the iron doors of the safe, broke some of the iron girders which supported the glass and stones forming the pavement, set fire to the woodwork, and seriously damaged the premises and the stock of goods in the basement. The plaintiffs thereby sustained damage to the amount of six thousand two hundred and sixty-six and $\frac{25}{100}$ dollars ($6266.25).

How or by whom the gas main was broken, the evidence failed to show. The pipe was of good quality, and had been laid for several years, during which time no leakage from it appeared to have taken place. No other property in the neighborhood is shown to have been damaged by the breaking of the pipe, or the escape or explosion of the gas No negligence was proved on the part of the defendant or of the contractor.

The referee decided, *inter alia:*

" Plaintiffs contend that the city had no authority from

[Strawbridge *et al. v.* The City of Philadelphia.]

the Commonwealth to place the gas-pipes in the street, that it is only carrying on a private commercial adventure, and that the injury resulting therefrom must be compensated, irrespective of negligence.

" A careful examination of the authorities has satisfied the referee that this position is not well taken, and that no recovery could be sustained in this case against the city for the damages which the plaintiffs suffered, without proof of negligence.

" If the injury to the plaintiffs had resulted from the negligence of the contractor, their action would not be against the city, but against him : Painter *v.* City of Pittsburgh, 10 Wright, 213 ; Reed *v.* Allegheny, 29 P. F. Smith, 300 ; Wray *v.* Evans, 30 P. F. Smith, 103 ; Elliott *v.* Philadelphia, 25 P. F. Smith, 347 ; City of Erie *v.* Caulkins, 5 W. N. C., 129.

" But in this case it is admitted that no negligence has been shown on the part of the contractor, or of the city.

" This is not a case of nuisance. A business, which is lawful, and is carried on reasonably, and which does not necessarily affect health, comfort, or the ordinary uses and enjoyment of property in the neighborhood, cannot be a nuisance : Rhodes *v.* Dunbar, 7 P. F. Smith, 290.

" It was certainly lawful for the city to manufacture gas for the purpose of public and private illumination. The transmission of the gas manufactured through pipes of good quality, laid under the streets, was not carrying on such business in an unreasonable way, and did not necessarily affect the health or comfort of the plaintiffs, or their ordinary use and enjoyment of their property.

" This case is, therefore, readily distinguishable from Pottstown Gas Company *v.* Murphy, 3 Wright, 257 ; Shuter *v.* The City of Philadelphia, 3 Philadelphia, 228 ; Smith *v.* Phillips, 8 Philadelphia, 10 ; Imperial Gaslight Company *v.* Broadbent, 7 H. of L., 600 ; Bamford *v.* Turnley, 113 Com. L., 62 ; St. Helen's Smelting Company *v.* Tipping, 11 H. of L., 642 ; Phinizy *v.* City Councils of Augusta, 47 Ga., 260 ; Cahill *et al. v.* Eastman *et al.*, 18 Minn., 324 ; Wilson *v.* City of New Bedford, 108 Mass., 261 ; and many similar cases, which were all clearly cases of nuisance.

&ast;        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;

" Indeed all of these cases, and many others which might be cited, were cases into which the question of negligence or no negligence did not enter, because the defendants' acts amounted to nuisances, the injury inflicted upon plaintiffs being the direct and necessary consequences of the defendants' operations.

" If the escape of gas into the plaintiffs' premises had been

shown to have been the result of the use by the city of imperfect and insufficient pipes, the city would be responsible on the ground of negligence.

"If its escape into the plaintiffs' basement had been shown to have been the direct and necessary or unavoidable consequence of placing the gas-pipes under the street, and near the plaintiffs' premises, the city would be responsible, because it thereby created a nuisance, and the question of the city's negligence would not be considered in passing upon the question of the city's liability, any more than would be the question of motive. Negligence need not be shown where the nuisance is established, and no amount of care or diligence exempts him who sets up a nuisance, whereby I am injured, from the legal necessity to compensate me for the loss or injury he has caused me.

"But the injury, which these plaintiffs suffered, was not the result of the ci'y's negligence, in using imperfect and insufficient pipe, nor was it the direct and necessary consequence of the city's placing gas-pipes along and under Eighth Street. The pipes themselves were of good quality, and during the several years, which had passed from the time when they were first laid, neither the plaintiffs, nor any one in their neighborhood, had suffered any injury or inconvenience therefrom. If the pipe had not been broken on the 10th of August, 1874, no injury of any kind would probably have ever resulted to the plaintiffs from this use of the streets by the city for public and private convenience. Certainly, it will not be contended (indeed, it was not urged upon the argument) that the city was maintaining a nuisance whereby the plaintiffs were injured, and that, therefore, the damages suffered must be compensated without proof of negligence.

"But the plaintiffs' counsel do contend that injury resulting from the conduct of private business must be compensated at law and in equity, irrespective of negligence, under the general maxim *Sic utere tuo ut alienum non lædas,* and, under the principle laid down in Fletcher *v* Rylands, L. R., 3 H. of L., 330, that one who, for his own advantage, brings upon his premises any dangerous thing, likely to escape and do mischief, must pay for all damages which result, if it does escape, irrespective of negligence.

"While the doctrine in that case has been affirmed by some of the courts of this country, in cases of nuisance, or where the damage was the direct and necessary consequence of the defendants' acts, the New York Court of Appeals recently, in a carefully considered and elaborate opinion, reviewing all the American authorities, and the reasoning of

[Strawbridge *et al. v.* The City of Philadelphia.]

which seems to be unanswerable (Losee *v.* Buchanan, 51 N. Y , 476), decided that such had never been the law in this country, and that no man, without fault or negligence on his part, could be held liable for damages accidentally resulting from the conduct of a lawful business on his own premises, where such business, or the mode of conducting it, does not amount to a nuisance.

\*        \*        \*        \*        \*        \*        \*

" In a very recent case decided by our own Supreme Court, Sanderson *v.* Pennsylvania Coal Company, 6 W. N. C., 97, the principle laid down in Fletcher *v.* Rylands was cited and approved as applying to the case under consideration, which was in every essential a case of nuisance.  The plaintiff had purchased and improved a property by building on it a handsome house, and one of the inducements to the purchase was a beautiful stream of pure water, which was traced to its source before the purchase was made, and which was afterwards utilized for family use, bath houses, fish tanks, etc.   After the plaintiff had improved his property, and made these uses of the stream, the defendants opened a colliery some distance away, and, in the prosecution of work therein, pumped out of their mine waste water, strongly impregnated with acids and minerals.   This water flowed off their land into the stream and polluted it, so that when it reached the plaintiff's premises it was wholly corrupted and unfit for use, and had to be abandoned.   It corroded the pipes through which it passed, and fish died in the tanks into which it had been caused to flow.

" It was strongly urged, on behalf of the defendant, that it was conducting a lawful business on its premises which could not be successfully prosecuted without pumping the waste water out of the mine, and the injury done to the stream which ran through plaintiff's grounds was one of the unavoidable results of the prosecution of a business which formed part of one of the greatest manufacturing interests of the State, its case was an exceptional one, and did not fall within the maxim *Sic utere tuo ut alienum non lœdas.*

" The Supreme Court held it was not exempted from the rule which required the owner of property to use it so as not to injure his neighbor.

" ' To render a particular case an exception,' they say, ' to the general principles controlling the exercise of dominion over property by its proprietor, it must be ascertained to be exceptional, in its surroundings or its facts.  From necessity the principles are sometimes relaxed.  They do not apply where it is impossible to gather safe facts to become bases for safe rules.'

"'But, except where it is qualified by the existence of peculiar conditions, the duty of the owner of property is defined by the maxim *Sic utere*,' etc.

"A recent England case, which is, in principle, closely analogous to this action against the city, and in which Fletcher *v.* Rylands was thoroughly discussed and distinguished, is Madras Railway Company *v.* The Zemindar of Carvatenagaram, 1 L. R. Ind. Ap., 364 (1874).

\* \* \* \* \* \*

"It must be evident, from the cases cited, that there is not, in this country at least, any such broad, general, and unbending rule of law as that contended for by the plaintiffs' counsel, by which every accidental injury caused to another by the lawful use of one's property, or by the lawful conduct of his business, must be compensated, irrespective of negligence, or which compels the city of Philadelphia to make compensation for injury done by the accidental escape of gas from its pipes, without fault or negligence on its part.

"Even if the doctrine of Fletcher *v.* Rylands were accepted as the rule of law in Pennsylvania in analogous cases, there are such manifest and essential differences between the facts of that case and of the one now under consideration as to render it extremely doubtful as to whether it is applicable to a case like the present one.

"In that case the defendants built a large reservoir for the convenience of a mill which they were operating. For their sole advantage they collected in it an unusually large quantity of water, which would probably, if not necessarily, do harm to their neighbor's property in the event of its escaping, and which naturally and certainly would escape unless restrained from doing so by the precautionary measures taken by the defendants. It was, therefore, an essentially and highly dangerous thing which they brought upon their premises, and there was consequently imposed upon them the duty of restraining it, for they brought it there at their peril. If they selected an unsafe site, or built insecure and insufficient walls, they fell short of their duty, and cannot be said to be without fault.

"Yet this is just what they did do, for it was afterwards discovered that the engineers that they had employed had placed the reservoir over two old shafts of abandoned mines, of the existence of which they were ignorant, and, when the reservoir was partly filled with water, the intervening soil between the bottom of the reservoir and one of these shafts gave way, and the water found its way into a neighboring · colliery and damaged it. The engineers had failed to make suitable and necessary provision for the support of the water

they brought upon the premises, and this was the undoubted cause of the accident.   How can it be said that the defendants were without fault ?

"But in the present case the city is carrying on a business which, while for certain purposes it must be treated as a private business, cannot but be considered as a great public improvement, of inestimable benefit to all its citizens, by which property is made more valuable, and life and person more secure.   And in all these benefits the plaintiffs directly shared.   They were thereby greatly facilitated in carrying on their large business in safety and with profit.   It was in no sense a business conducted by the city for its sole advantage.   And may not the defendants, as citizens of the municipality, sharing in the benefits and advantages of the business thus conducted, and especially in view of the fact that these pipes were laid in the streets by virtue of an ordinance of the councils of the city legally passed and approved, be presumed to have consented to such a use of the streets for their individual, as well as for the general, good ?   And to have waived their right to compensation for injury accidentally resulting to them therefrom, where neither fault nor negligence on the part of the city could be established ?

"Again, there was nothing in the business which the city was carrying on essentially dangerous.   While the use of gas for illuminating purposes is now almost universal, and the streets of every large town and city in the civilized world are used for its transmission through pipes, experience does not show that its transmission in this manner is necessarily liable to accident.   On the contrary, it shows that the kind · of pipes which are generally used for the purpose are amply sufficient to prevent it from escaping and doing harm, unless broken by some extraneous force.

"Lastly, unlike the case of Fletcher *v.* Rylands, where the cause of the accident was manifestly the failure to select a safe site for the reservoir, and to provide a secure support for the dangerous mass of water which the defendant brought upon his premises, at his peril, the cause of the breaking of this pipe and the consequent escape of gas by which the plaintiffs were damaged, is and must remain unknown.   It may have resulted from a slight sinking of the plaintiffs' own vault and the consequent pressure on the pipe sufficient to break it ; or from the wanton or malicious act of some third person; or from some undiscovered defect in the pipe provided by the city, or in the supports placed under it by the contractor.   The evidence fails to disclose from which of these possible causes it resulted.

"Would it not be straining the principle of Fletcher *v.* Ry-

lands beyond reason to apply it to a case so essentially different? The distinction drawn in Madras Railway Co. *v.* The Zemindar, between that case and the former, seems particularly applicable to the present case.

"Here the city, in the interest and for the benefit of the community, took upon itself the work of manufacturing and supplying gas for public and private illumination. The lighting of its streets is indeed a work of great public necessity, and the lighting of them in this way is the only practicable mode of doing so which science has yet discovered. To do so was a duty imposed upon the city as a municipal corporation. The conduct of this business was, therefore, impressed with the character of lawfulness, and although the maintenance of it may be, in some particular circumstances, dangerous to the interests of private persons, it is by the character which the city, acting for the community, impressed upon it, removed from the class of dangerous and noxious things which a man brings and keeps at his peril.

"May it not also be said that 'the rights and liabilities of the defendant' are 'analogous to those of persons and corporations on whom statutory powers have been conferred and statutory duties imposed?'

"This would seem to be one of those exceptional cases referred to by our Supreme Court in Sanderson *v.* Pa. Coal Co., 6 W. N. C., 97, where, by reason of the 'existence of peculiar conditions,' the maxim *Sic utere*, etc., does not apply, and where 'from necessity the principles are sometimes relaxed,' because 'they do not apply where it is impossible to gather safe facts to become bases of safe rules.'

"But it is urged by the plaintiffs' counsel that the city is responsible for the damage which resulted, because it had no authority from the Commonwealth to lay gas-pipes in the street.

"The question of the city's liability in this action has thus far been considered on the assumption that no such authority had, in fact, been conferred upon it by statute.

"It seems that in Great Britain, express legislative sanction is necessary to warrant the laying down of gas-pipes in the public highways (2 Dillon on Municipal Corp., § 546); and in City of Boston *v.* Richardson, 13 Allen, 146, while it was held that a town may make a common sewer and drains under the highway for the cleansing of the streets and the accommodation of the inhabitants on either side, whether it owns the soil or not, it was doubted whether gas pipes or railroads could be laid without express legislative grant.

[Strawbridge *et al. v.* The City of Philadelphia.]

" In this State, in Fisher *v.* Harrisburg, 2 Gr. Cas., 291, it was held that a municipal corporation has power to make sewers, without any special authority given with that view.

" No substantial reason is to be found given anywhere in the books why a municipal corporation which has the inherent power to construct sewers, may not also, without express legislative sanction, lay gas-pipes under the highways for the benefit of its citizens. It would be difficult to see wherein the one is not as essential to public comfort and convenience as the other.

" In Milhau *v.* Sharp, 15 Barb., 193, in considering the right of the city to authorize the building of a street railway on Broadway, the Court said with great force, that ' there is a wide difference between a highway in the country and a street in a populous commercial city. The city of New York has the power to authorize the appropriation of its streets to all such uses as are conducive to the public good, and do not interfere with their complete and unrestricted use as highways ; and in doing so it is not obliged to confine itself to such uses as have already been permitted. As civilization advances, new uses may be found expedient.'

" To hold at this advanced day, that the city of Philadelphia, with its enormous population and almost unparalleled manufacturing interest, requiring, as a necessity, all the latest conveniences in lighting its streets and in supplying public and private buildings with the best-known means of illumination, has not the right to lay gas-pipes, controlled by itself, under the highways, without express legislative sanction, would require a clinging to ancient and threadbare precedents with a blind and unreasoning tenacity which has never characterized the courts of this Commonwealth.

" But from an examination of the acts of incorporation, it does not appear that the city has such legislative sanction but by implication.

" The original charter granted by William Penn, in 1701, provided ' that the streets of the said city shall forever continue as they are now laid out and regulated ; and that the end of each street extending into the river Delaware, shall be and continue free, for the use and service of the said city, and the inhabitants thereof, who may improve the same for the best advantage of the city :' Lawber Ord. Phila., 1701–1812, p. 1.

" The Act of April 2d, 1790, entitled ' A further supplement to the act entitled " An act to incorporate the city of Philadelphia," ' provided, among other things, as follows, viz. :

" ' And whereas, some of the existing laws relative to the

paving, lighting, and watching of the streets of the city of Philadelphia contain regulations which are now somewhat inconvenient, and others which may be improved; wherefore it will be most convenient and proper to invest the said mayor, aldermen, and citizens of Philadelphia with the power of legislating, estimating and raising taxes, so far as respects lighting, watching, watering, pitching, paving, and cleansing the streets of the city unrestrained by any of the said existing laws relative thereto, therefore, be it enacted,' etc., ' that from and after the passage of this act, the mayor, recorder, aldermen, and common councilmen in common council assembled, shall have full power and authority to make, ordain, constitute, and establish, such and so many laws, ordinances, regulations, and constitutions, as may be convenient and necessary for the purpose of . . . . lighting, watching, watering, pitching, paving, and cleansing the said streets, lanes, and alleys,' etc.

" And in pursuance of the power thus conferred, it was afterwards provided by section 4 of the ordinance of March 21st, 1835, duly passed and approved, ' that it shall be the duty of the trustees so appointed, to proceed forthwith to construct suitable works for the manufacture of carburetted hydrogen gas from bituminous coal, for the purpose of public and private illumination, and to lay pipes for its distribution through the city.'

" It has been held that where the charter gives to the city in terms the power to supply water, or authorize the inhabitants to be supplied with water, the municipal councils may use, or as an incidental power, may permit the contractor to use, the streets for this purpose: 2 Dillon on Municipal Corp., sec. 551.

"And also, that the city councils being authorized by charter to cause the city to be lighted with oil or gas, it might authorize the use of the streets for laying gas-pipes : State *v.* Cincinnati Gas Light Company, 18 Ohio St. Rep., 295.

" Where a person or corporation is authorized by law to do a particular thing, or to carry on a particular class of business, or for the manufacture of gas to supply the people of a town or city therewith, so long as they keep within the scope of the power granted, they are completely protected from indictment and punishment for a public nuisance, or from proceedings at law or in equity in behalf of the public therefor : Wood on Nuisances, sec. 746.

" And in Blyth *v.* Birmingham Water Works Company, 25 L. J. (Ex.), 212, it was decided that a water works company, laying down pipes by a statutory power, were not liable for

[Strawbridge *et al. v.* The City of Philadelphia.]

damages occasioned by water escaping in consequence of a fire-plug being forced out by a frost of unusual severity.

" A similar doctrine was laid down in Vaughan *v.* Taff Vale Railway Company, 5 H. & N., 679, and in numerous other English and American cases.

" The conclusion, therefore, seems to be that the city of Philadelphia, having the right by statute to legislate fully in regard to lighting the streets, had, by implication, the power to direct by ordinance that gas-pipes should be laid in the streets for the purpose of lighting them ; and that as the gas-pipe which passed the plaintiffs' premises was laid under the ordinance of March 21st, 1835, the city would not be responsible for damages resulting to the plaintiffs therefrom, without proof of negligence.

" This branch of the case has been considered thus fully on account of the importance of the question involved, and of the dangerous precedent that would be established by holding the city liable for any damage resulting from an accidental breaking of any portion of the hundreds of miles of gas-pipe which it operates, when no fault or negligence on its part was established.

" But there is another ground on which it seems that the plaintiffs cannot possibly hold the city responsible for the damages which they sustained.

" The plaintiffs themselves provided the means for the gas which escaped from the pipe to get into their premises.

" In violation of the ordinance of November 12th, 1855, which prohibited the building of vaults beyond the curb line, they made an excavation into the street two feet six inches beyond the curb line, and solely for their own convenience, built therein the vault, around, under, and through which the gas passed from the street into their premises. Irrespective of the ordinance, they had no right to make such a use of the street. By doing so they removed the natural barrier of earth which stood between the pipe and the premises, and which, if they had not removed it, would probably have made it impossible for the gas to get into their basement. But they did more than simply remove or weaken the barrier between themselves and the gas; they opened, and left open, a communication between the pipe and their basement, so that when the pipe was broken, the gas naturally and necessarily found its way around the other walls of their safe, and through the air-chamber between the two walls, and under and through the safe itself, into their basement. 'If it had been a case of nuisance, there would have been a coming to the nuisance.' How then can the city be held liable for the damages done by the explo-

[Strawbridge *et al. v.* The City of Philadelphia.]

sion of gas which the plaintiffs themselves brought, or assisted to bring upon their premises ?   Suppose they had dug a trench out to the water main, and on its breaking, by reason of the use of imperfect pipe, the water had flowed into their basement and flooded it, would they not be guilty of contributory negligence, and precluded from recovering even when negligence was thus established on the part of the city ?   From the facts of the case, it seems possible, or even probable, that the pipe was broken by the pressure upon it of this vault which the plaintiffs, in violation of law, had built out into the street.   But it is more than probable that if it had not been for the excavation and the vault, the gas which escaped, when the pipe was broken from whatever cause, would not and could not have made its way into their basement, exploded and caused the damages, compensation for which they now seek to recover.   No other property in the neighborhood seems to have suffered any injury from this escape of gas, and it would be manifestly unjust to make the city reimburse the plaintiffs for the loss which they sustained by an accident, which happened, so far as the facts ascertained show, without any fault or negligence on the part of the city, and to bring which about, the plaintiffs' own acts, in excavating into and building in the street, so largely contributed.

" On both grounds, therefore, the referee finds himself compelled to decide against the plaintiffs' right to recover in this action."

The referee awarded in favor of the defendant, and that the plaintiffs' pay the costs.

Exceptions were filed to this award, which the Court below, THAYER, P. J., dismissed, and he, July 5th, 1879, confirmed the award in the following opinion :

" After the most careful examination of the facts and of the principles of law involved in this case, which is one of much importance, not only in its individual aspects, but also in its public relations, we are of opinion that the conclusion reached by the referee is in harmony with the well-settled law of this State, and that the plaintiffs have no cause of action whatever against the defendant.   The whole subject is discussed with so much learning and ability by the referee in his report, that it is necessary to say very little beyond this, that we adopt his views of the case, which are maintained by abundant authority.   The case of Rylands *v.* Fletcher, Law R., 3 H. L., 330 ; S. C. Law R., 1 Ex., 265, which is principally, indeed, we may say almost exclusively, relied upon by the plaintiffs' counsel, is by no means conclusive of the present case, although it bears a strong resem-

blance to it in some of its general features. Leaving entirely out of the case the question of contributory negligence on the part of the plaintiffs arising out of their violation of the city ordinance of November 12th, 1855, which prohibited the building of vaults beyond the curb line, and even conceding for the sake of the argument that illuminating gas collected in large quantities possesses some elements of danger, yet it must be obvious that there is a great difference between bringing upon one's premises a dangerous substance or element for private profit, and the introduction of that substance or element for public convenience by authority of law.   In the former case a man may well be held responsible for results which naturally arise out of the dangerous character of the thing itself, for he may be said to assume the risk of all consequences, just as a man assumes the risk of all accidents which may happen from keeping upon his premises animals which are *feræ naturæ*, without regard to any question of negligence in their keeping.   On the other hand, it may be said without fear of contradiction, that no man can be held responsible for doing that which he is expressly authorized by law to do, unless he is guilty of some negligence or misconduct in connection with it.   In such cases, what is authorized to be done must be done in a careful manner.   This is the whole obligation, and unless there be negligence, no action for damages can be maintained for acts which are within the scope of an express authority conferred by law.

"That the introduction of gas and the carrying of it by mains through the streets for the purpose of lighting the city is a statutory power conferred upon the city of Philadelphia, admits of no doubt.   The Act of April 2d, 1790, gave the city full power to ordain and establish whatever laws might be convenient or necessary for the purpose of lighting the city, and the ordinance of March 21st, 1835, directing the laying of pipes through the city for the distribution of gas, was a lawful exercise of the power thus conferred by the legislature upon the city.   It has been so determined in many cases in which the extent of municipal authority under such grants has been discussed.   Indeed, it has never been doubted.   The distinguished citizens who, on the 28th of November, 1833, presented to the city councils their celebrated remonstrance against the plan of lighting the city with gas, enumerated in that earnest and solemn document (which is now before us) every objection which occurred to them.   They represented that gas was an article as ignitible as gunpowder, and as fatal in its effects; that it would, by explosions and conflagrations, cause an immense

destruction of property and an appalling loss of life; that 'it would contaminate all the waters of the Delaware and Schuylkill, and would destroy the immense shoals of shad, herring, and other fish with which they abound;' but it was not suggested by the remonstrants that the proposed action of councils was contrary to law, or beyond the powers conferred by the legislature upon the city, although among the signers were such eminent lawyers as Horace Binney, John Sergeant, Benjamin Chew, William J. Duane, Joseph P. Norris, and William L. Hirst, and such citizens as Dr. Physick, Hartman Kuhn, James C. Fisher, John C. Cresson, Matthew Newkirk, Paul Beck, Roberts Vaux, and hundreds of others of distinguished intelligence and prominence. Fortunately the grave fears which were then entertained have been demonstrated to be unfounded, by an experience of more than forty years, and no instance, we apprehend, can be recalled, in all that period, of injury resulting from gas in the street mains, which was not clearly traceable to negligence or improper intermeddling. That the injury suffered by the plaintiffs in the present case was due to one or the other of these causes, we entertain no doubt whatever, but as the facts found by the referee conclusively show that the fault did not lie at the door of the city, he could do no otherwise than find for the defendant. In that finding we entirely concur, and the exceptions are therefore to be dismissed, and the award confirmed."

The plaintiffs then took out a writ of error, assigning as errors the dismissal of the exceptions and entering of judgment for the defendant, and the refusal to enter judgment for the plaintiffs for $6266.25 and interest.

*David W. Sellers,* for plaintiff in error.

The manufacture and distribution of gas by the defendant in error creates the same relation as to liabilities which would exist if the same were done by a private trading corporation: 7 Casey, 183.

The manufacture and distribution of gas being private and for profit, any damages caused by the conduct of the business must be met irrespective of the question of negligence, on the principle that injuries arising to common-law estates are remedied if the cause is from a non-natural factor: Shuter *v.* The City, 3 Phila., 228; Pottstown Gas Co. *v.* Murphy, 3 Wr., 257; Sanderson *v.* Coal Co., 5 Norris, 401, as to what constitutes a nuisance in Wood's Treatise, sec. 115; Wilson *v.* New Bedford, 108 Mass., 261; Cahill *v.* Eastman, 18 Minn., 324; Phinizey *v.* Augusta, 47 Georgia, 263.

The opinion of the Court below, stating that " it was not

suggested that lighting the streets with gas was contrary to law, or beyond the power of the city," is a misapprehension of the argument of counsel. It is conceded that the manufacture and distribution of gas is lawful, but it is contended that the same was not coupled with a right of eminent domain to which was annexed the duty of compensation, and, therefore, it was within the doctrine announced in Gas Co. *v.* Murphy, 3 Wright, 257.

*C. E. Morgan, Jr.*, and *William Nelson West* (city solicitor), for defendant in error.

*First.* The authorities relied upon by the plaintiff apply only to two classes of cases.

*a.* Those where the damage is caused by a nuisance.

*b.* Those where the injury results from an unnatural use of property, and such a use as renders it dangerous and " likely to do mischief."

*Second.* The case now before the Court is not within either of the classes mentioned.

The business of lighting the city by gas, is authorized by the act of Assembly of April 2d, 1790, and cannot, therefore, be regarded as a nuisance *per se:* Vaughan *v.* Taff Vale Railway Co., 5 Hurl. & Nor., 679.

*Third.* The plaintiffs contributed to their own injury by their negligent and unlawful construction of their vault. This alone would defeat their recovery.

JANUARY 16TH, 1882.—PER CURIAM: We affirm this judgment upon the very able and exhaustive opinion of the learned referee in the Court below.

Judgment affirmed.

JULY TERM, 1881, No. 53.              JANUARY 12TH, 1882.

# Appeal of the Union Passenger Railway Company.

1. The complainants, by their charter dated April 8th, 1859, were empowered " to lay out and construct a railway from the intersection of Carpenter and Thirteenth streets; thence north along said Thirteenth Street to Columbia Avenue; thence west along said Columbia Avenue to Fifteenth Street; thence south along said Fifteenth Street to Carpenter Street; thence east along said Carpenter Street to the place of beginning; and with power also to lay out and construct a railway from the intersection of Fifteenth Street and Columbia Avenue to Ridge Avenue, . . . . and from Ridge Avenue along Master Street